UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY MENDELBLATT,

                Plaintiff,                No. 14-cv-12140

vs.                                      Hon. Gerald E. Rosen

AETNA LIFE INSURANCE COMPANY,

                Defendant.
_____/

OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR ENTRY OF JUDGMENT ON THE ADMINISTRATIVE
RECORD [DKT. # 24] AND DENYING PLAINTIFF'S MOTION
FOR ENTRY OF JUDGMENT UNDER *WILKINS* [DKT. # 25]

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on February 22, 2016

PRESENT:  Honorable Gerald E. Rosen
                   United States District Judge

## I.  INTRODUCTION

This ERISA denial of benefits action is before the Court on the Cross-Motions of

Defendant Aetna Life Insurance Company ("Aetna")  and Plaintiff Gary Mendelblatt,

respectively requesting affirmance and reversal of the ERISA plan administrator's

decision terminating Mr. Mendelblatt's long-term disability benefit payments.  Having

reviewed  Plaintiff's and Defendant's briefs and the Administrative Record in this matter,

the Court has determined that oral argument is not necessary.  Therefore, pursuant to Local Rule 7.1(f)(2), this matter will be decided on the briefs.  This Opinion and Order sets forth the Court's ruling.

## II.  <u>PERTINENT FACTS</u>

<u>BACKGROUND</u>

Plaintiff Gary Mendelblatt, a resident of Thiensville, Wisconsin, was employed by the Auto Club Group ("Auto Club") as a sales compliance consultant from January 31, 2002 until January 31, 2008.  At the time he ceased working, Mendelblatt was 56 years old.

As a sales compliance consultant, Mendelblatt conducted regulatory meetings and NASD compliance reviews of Auto Club representatives, and developed and made presentations at large group meetings at various Auto Club offices in his region. [Admin. Rec., Mendelblatt Claim p. 34.][1] These included offices in Wisconsin, Minnesota and Iowa.  R. 834.  Mendelblatt traveled by car to these offices.  Mendelblatt's manager estimated that the job required Mendelblatt to drive once a week for one hour; once or twice a month his driving trips would be longer -- three or four hours.  *Id.*  Additionally, four times a year, he was required to fly to Auto Club headquarters in Michigan.  *Id.*

_____

[1]  The Administrative Record is filed under seal at Dkt. # 19.  It consists of Mendelblatt's 1,406-page claim file (referred to hereinafter simply as "R" followed by the page number); the Auto Club Salaried Employees  LTD Benefits Plan (referred to herein as "Plan p. ___"): and three surveillance video DVDs, dated April 6, 2011, July 20, 2015, and October 15, 2013.

Over the course of his lifetime, Mendelblatt had a number of medical issues particularly with his back/spine and joints, most notably degenerative disc disease ("DDD") and psoriatic/rheumatoid arthritis. On February 1, 2008, Mendelblatt applied for Extended Sick Leave("ESL")/Temporary Disability Income ("TDI"). Aetna administers the ESL/TDI program on behalf of Auto Club.

Mendelblatt began receiving ESL/TDI benefits February 8, 2008. Mendelblatt's eligibility for these short-term disability benefits, however, was short-lived as his position with Auto Club was eliminated on February 29, 2008; hence, he was no longer eligible for ESL/TDI as of that date. [R. 113-114; 127; 889.][2] However, because he was disabled prior to the date that his job was eliminated, on June 20, 2008, Aetna informed Mendelblatt that he would be eligible for Long-Term Disability ("LTD") benefits under the Auto Club benefits plan if his disability was shown to be continuous since February 1, 2008. [R. 114; 889; *see also* Plan, pp. 30, 34.]

THE AUTO CLUB LONG-TERM DISABILITY PLAN

The Auto Club LTD Plan is a fully contributory plan, underwritten by Defendant Aetna. [*See* Plan, pp. 28, 33.] After a 6-month waiting period, the LTD Plan pays a monthly benefit for a period of disability caused by a disease or injury. *Id.* pp. 30, 34. Under the Plan, disability/disabled is defined as follows:

---

[2] The record indicates that Plaintiff was made aware of the elimination of his position before Aetna informed him of the resulting termination of his short-term disability benefits. *See* R. 113-114.

3

**Test of Disability**

From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:

- you are not able to perform the **material duties** of your **own occupation** solely because of disease or injury; and

- your work earnings are 80% or less of your adjusted predisability earnings.

After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any **reasonable occupation** solely because of

- disease; or
- injury

[Plan, p. 34 (emphasis in original).]

The Auto Club Plan further defines "own occupation" as follows:

This is the occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is *normally performed in the national economy* instead of how it is performed:

- for your specific employer; or
- at your location or work site; and

without regard to your specific reporting relationship.

*Id.*, p. 45 (emphasis added).

The Plan also defines "reasonable occupation":

This is any gainful activity for which you are; or may reasonable become fitted by:  education, training, or experience; and which results in; or can be expected to result in; an income of more than 80% of your **adjusted**

4

**predisability earnings**.

*Id.*, p. 46 (emphasis in original).

The Plan also delineates when a "period of disability" starts and ends.  In relevant

part, the Plan provides as follows:

**A Period of Disability**

A period of disability starts on the first day you are disabled as a direct
result of a significant change in your physical or mental condition occurring
while you are insured under this Plan. . . .

Your period of disability ends on the first to occur of:

•        The date Aetna finds you are no longer disabled or the date you fail
         to furnish proof that you are disabled.
•        The date Aetna finds that you have withheld information which
         indicates you are performing, or are capable of performing, the
         duties of a reasonable occupation.
                                    * * *
         The date you reach the end of your Maximum Benefit
         Duration.
                                    * * *
•        The date your condition would permit you to work, or increase the
         number of hours you work, or the number or type of duties you
         perform in your own occupation, but you refuse to do so. . . .

[Plan, p. 35.]

The Auto Club Plan also calls for an offset of other income benefits, including

Social Security Disability/Retirement benefits.  *Id.*, pp. 35-36.  Pursuant to the Plan, even

when a beneficiary continues to be disabled, benefits cease when the beneficiary reaches

normal retirement age.  *Id.* p. 31.

The Plan also vests Aetna with discretionary authority to determine eligibility for

5

benefits and construe the terms of the Plan:

> Under Section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary. It has complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:
>
> > determine whether and to what extent employees and beneficiaries are entitled to benefits; and
> > construe any disputed or doubtful terms of this policy.
>
> Aetna shall be deemed to have properly exercised such authority. It must not abuse its discretion by acting arbitrarily and capriciously. Aetna has the right to adopt reasonable:
>
> > policies;
> > procedures;
> > rules, and
> > interpretations;
>
> of this policy to promote orderly and efficient administration.

*Id.*, p. 25.

## PLAINTIFF'S CLAIM FOR LTD BENEFITS

On June 8, 2008, Mendelblatt applied for LTD benefits. In his application, Mendelblatt gave as his illness/injury "psoriatic arthritis, back-disc problems, hand problems and fibromyalgia" and added that his "left knee needs replacement." R. 956. He stated that he was unable to work because he "c[ould] not travel, write well, hold things, stand up for more than 5 minutes" and that he was "hunched over" and his "neck, hands, knee [and] back hurt constantly." *Id.*   In conjunction with his application, Mendelblatt also completed a Work History and Education Questionnaire in which he

6

stated that his job required him to travel and he could not perform his job because he "cannot travel, handle luggage, or walk more than 100 yds." [R. 883.] He also stated in that questionnaire that he "played golf occasionally" but after his disability, he "cannot hold clubs, walk courses, bend at all, hold back straight up or swing club." R. 884.

Upon receipt of Mendelblatt's application for LTD benefits, a vocational assessment of Mendelblatt's compliance consultant position was conducted. [R. 990-991.] Based on that vocational assessment, Plaintiff's position was classified as "sedentary," which meant that the job entailed mostly sitting, but also involved standing or walking for brief periods of time, and also required occasional lifting, carrying pushing or pulling up to 10 pounds. *Id.*

Aetna also requested and obtained records from Dr. Mark Schrager, Dr. Stephen Robbins, and Dr. John Roffers, the treating physicians identified in Mendelblatt's application. Based upon a review of the records submitted by these doctors and Plaintiff's self-report, Aetna determined that the overall assessment of Mendelblatt's multiple clinical conditions supported finding him disabled in his own occupation. [*See* R. 28-30.]

Accordingly, Aetna approved Mendelblatt for LTD benefits from July 30 through October 31, 2008. [R. 838; 1278-79.] Mendelblatt was notified, however, that to continue receiving benefits beyond October 31, 2008, updated medical documentation would be required periodically and had to be submitted by his health care providers at

least seven days before the expiration of an approved period of disability.  [R. 1278.]

Not long thereafter, on August 27, 2008, Aetna sent Mendelblatt a letter notifying him that its records indicated that he might be eligible for Social Security Disability Insurance ("SSDI") benefits and that he should consider applying for such benefits.  [*See* R. 821].  To assist him with a Social Security disability application, Aetna put him in touch with a specialized claims administration company that provides Social Security assistance services to disability applicants.  *Id.*

Plaintiff did, in fact, apply for, and was awarded, SSDI benefits. Aetna was informed by the Social Security Administration of the amount of Mendelblatt's award of SSDI benefits on January 6, 2009.  [*See* R. 791-92.]  However, other than the amount of the award, no information was provided to Aetna regarding the nature of Mendelblatt's SSDI claim or the basis for the Social Security Administration's disability determination.

On January 15, 2009, Mendelblatt was informed that, as provided in the Auto Club Plan, his LTD amount would be offset by the amount of SSDI award.  [R. 250.]

Meanwhile, upon follow-up clinical reviews in October 2008 and January 2009, Aetna was satisfied that updated medical records submitted by Mendelblatt and his doctors continued to support finding Plaintiff impaired in his own occupation. [R. 1016, 1037.]  In August 2009, however, Aetna found that the updated medical records were insufficient to support a continued functional impairment in Mendelblatt's own occupation.  This determination was based upon notations in the records that Mendelblatt

8

was able to play golf in Florida despite his continued subjective complaints of pain. [R. 1038.] Nonetheless, based on the totality of the evidence presented, Aetna was not convinced at that time that the objective findings were sufficient to preclude Mendelblatt from continuing to receive LTD benefits. *Id.*

In order to ascertain whether Mendelblatt continued to be disabled, Aetna requested Dr. Sara Kramer, a specialist in internal medicine and rheumatology, to conduct a peer-to-peer consultation with Plaintiff's then treating rheumatologist, Dr. Marc Schrager. A peer-to-peer consultation was conducted on September 25, 2009. [*See* R. 723-26.] Dr. Schrager indicated in that consultation that Mendelblatt did "have restrictions and would not be able to stand for prolonged periods of time and would need to be able to change positions frequently." *Id.* at R. 724. However, although Dr. Schrager acknowledged that Mendelblatt had physical limitations, he opined that Mendelblatt "was capable of doing more than he indicated." *Id.* at 725. From a rheumatologic perspective, it was Schrager's opinion that Mendelblatt "would have the ability to sit for six hours out of an eight hour day." *Id.* Dr. Schrager, however, declined to offer any opinion as to Mendelblatt's strength, specifically his ability to lift 10 to 20 pounds, as that was beyond his area of expertise; he indicated that for that evaluation he would defer to the expertise of an orthopedic specialist. *Id.* Accordingly, arrangements were made for a follow-up with an orthopedic specialist. Meanwhile, Mendelblatt's LTD benefits were continued.

9

On July 30, 2010, Mendelblatt's initial 24-month period of disability ended. As a consequence, after that date, to continue benefits, the medical evidence had to establish that Mendelblatt was totally disabled from engaging in "*any* reasonable occupation," not just his "own occupation." Mendelblatt, therefore, was notified that Aetna would be conducting a thorough evaluation of his claim to determine his eligibility for benefits beyond July 30, 2010 under this standard. [*See* R. 1290.]

Additional clinical information was thereafter obtained from Plaintiff's health care providers. On August 23, 2010, Aetna determined that this updated clinical information was "insufficient to support a functional impairment in [Plaintiff's] own and any occupation." [*See* R. 1079.] While these records showed that Mendelblatt had multiple joint issues, they also indicated that Plaintiff was functionally able to sustain a sedentary occupation.

Following this August 2010 review, Aetna decided that the case should be referred for surveillance of Mendelblatt to check his daily activities, in particular, to ascertain whether Mendelblatt was able to play golf, as there were multiple references in the medical records to Plaintiff playing multiple rounds of golf. [R. 1079-80.]

Surveillance, however, was not conducted immediately because Aetna was informed that Mendelblatt was scheduled for surgery on November 17, 2010. [R. 1117.] It was, therefore, decided that surveillance would be postponed for three months. *Id.* Meanwhile, Mendelblatt continued tor receive LTD benefits.

10

On December 3, 2010, an internet search was performed which showed that Mendelblatt was very active with golf and a golf course called "The Bog."  [*See* R. 1116.]  Mendelblatt was listed as a member of the board of directors of that course.  *Id.* The internet search also revealed that Mendelblatt had recently visited and written reviews of several golf courses in Florida.  *Id.*  On one site, he was listed as having earned "honors" for his score of 78.  *Id.*  Additionally, Mendelblatt posted on his Facebook page that he "lives" at the golf course, that he "play[s] golf everyday," and that he even had a hole-in-one the previous year.  *Id.*

Surveillance was subsequently conducted on Mendelblatt on April 6, 7 and 8, 2011 after Mendelblatt posted that he was looking forward to the opening day of his golf course on April 7th.  During this surveillance, however, Mendelblatt was only observed briefly outside of his residence, walking around his yard.  R. 1124.  The investigator did not see any outward signs of physical limitations or disabilities during this brief observation.  *Id.*

In the meantime, a clinical consultant review was performed on March 5, 2012. [R. 1137-43.]  Based on this review, Aetna determined that continued functional impairment was supported through May 30, 2012.  [R. 1142.]

A subsequent clinical review conducted on December 12, 2012 also provided support for continued functional impairment in any reasonable capacity through January 2013.  [R. 1173-76.]  The reviewing health care provider, however, specifically noted

11

that the information reviewed was based on older office notes and Plaintiff's self-report letter of October 31, 2012.  [R. 1176.]

To obtain more current information, on January 22, 2013, Aetna interviewed Plaintiff by phone. [*See* R. 1191.] In this interview, Mendelblatt stated that he was using a cane to walk but it was hard for him to use a cane because of the strength it takes in his hands.  *Id.*  He also stated that he rarely drives; that his is "just in the house" all day.  *Id.* He said he can sit for a while, but not very long, but then stated that he plays cards with his friends.  *Id.*

Notably, with respect to golf, Plaintiff told the Aetna interviewer that he is unable to golf.  *Id.*  He said that if he gets a cart, he can get out of the cart and hit, but he can't walk or putt on the green; he said he can only stand 4-5 minutes and then sit down.  *Id.* Mendelblatt further stated that he played "a few holes" last summer [i.e., summer 2012], but that was all, adding that he "would love to get back out and golf, but [he] can't do it." *Id.*

However, a subsequent online search appeared to contradict what Plaintiff said in his phone interview.  This search showed that Mendelblatt had notched honors scores for full rounds of golf in July and August 2012.  [*See* R. 1204.]  There was further evidence that Mendelblatt logged in eight different scores for full rounds of golf at five different courses, *id.*, including scores recorded in January and February 2013 at Florida golf courses.  [R. 1212.]

12

Nevertheless, on March 5, 2013, Dr. Farrukh Pasha, the attending rheumatologist who took over Mendelblatt's treatment after Dr. Schrager retired in December 2011,[3] submitted an opinion in support of Plaintiff's claim for LTD benefits in which he stated that Plaintiff was totally and permanently disabled as he could not sit, stand walk, lift or hand grasp sufficiently in the work environment. [R. 344, 346.] Dr. Pasha also completed a Capabilities and Limitations Worksheet in which he opined that Plaintiff was permanently and totally disabled. [R. 345.]

In light of the apparent conflict between what was discovered through the internet search and what Plaintiff and Dr. Pasha had stated, Aetna once again requested a background investigation and surveillance of Mr. Mendelblatt's activities. That surveillance was conducted on July 1, 2 and 12, 2013. While no activity was observed during this surveillance, the investigator did go to the clubhouse at Hidden Glen Golf Course near Mendelblatt's home on July 2, 2013, and spoke with a member of the golf club who confirmed that Mendelblatt was also member of the club and that he had last been seen golfing there just the month before, in May 2013. [R. 339.]

Shortly thereafter, Plaintiff notified Aetna that he was having another surgery -- this time for a problem with his esophagus -- on July 24, 2013. [R. 337.] Therefore, Aetna again suspended its investigation into Mendelblatt's activities, and continued to pay him LTD benefits.

_____

[3] *See* R. 504.

13

Surveillance and investigation were resumed on October 10 and 11, 2013. During this investigation it was discovered that Mendelblatt golfed 11 times in October 2013 and had documented 9 rounds of golf in September 2013 with golf scores ranging from 75 to 88. [R. 328.] Surveillance of Mendelblatt was also conducted, during which Mendelblatt was personally observed golfing for two consecutive days. [R. 322, 324-27.] He was observed casually riding in a golf cart, teeing off, bending down to pick up the ball, walking up a small hill, and bending to putt. *Id.* A surveillance video was made of these activities.[4]

On November 6, 2013, Aetna provided Dr. Pasha with the investigative report of the surveillance and photographs showing Plaintiff golfing and asked the doctor to comment on Plaintiff's functional ability. [R. 319-20.] Dr. Pasha responded that he was surprised to see the pictures and records provided by Aetna which, in the doctor's view, showed a "significant improvement" in Plaintiff's ability to function since the last disability evaluation done by Dr. Pasha on March 2013. [R. 314.] Based on this information, Dr. Pasha stated he would not be doing any further disability evaluations for Mr. Mendelblatt. *Id.*

On November 26, 2013, Aetna informed Plaintiff that it was terminating his LTD benefits effective November 26, 2013. Aetna's termination letter, in pertinent part, explained:

---

[4] A DVD of this surveillance as well as the earlier surveillances was provided to the Court as part of the Administrative Record.

14

The Auto Club Group, group policy (Policy) is underwritten by Aetna Life
Insurance Company (Aetna).

We are writing to you regarding your benefits provided by your employer
The Auto Club Group.  As a result of our recently completed review of
your claim, we have determined that you no longer meet the definition of
disability.  This determination is based upon the following information.

Your plan states:

"Test of Disability
From the date you first become disabled and until Monthly Benefits are
payable for 24 months, you will be deemed disabled on any day if:
•        you are not able to perform the material duties of your own
         occupation solely because of disease or injury; and
•        your work earnings are 80% or less of your adjusted predisability
         earnings.

After the first 24 months that any Monthly Benefit is payable during a
period of disability, you will be deemed to be disabled on any day if you
are not able to work at any reasonable occupation solely because of
•        disease; or
•        injury.

If your own occupation requires a professional or occupational license or
certification of any kind, you will not be deemed disabled because of the
loss of that license or certification."

We received an Attending Physician Statement from Dr. Pasha, signed
3/5/2013.  Dr. Pasha stated you had no ability to work with symptoms of
joint and back pain with stiffness.  Dr Pasha stated you are totally and
permanently disabled.  Dr. Pasha stated you cannot stand, walk, nor lift
your hands sufficiently for work situations.

The Capabilities and Limitations Worksheet completed by Dr. Pasha and
signed on 3/4/2013 states that you are to never:
climb, crawl, kneel, lift, pull, push, reach above shoulder, forward reach,
carry, bend, twist, hand grasp, use hands for manipulation, use hands for
repetitive motion, sit, stoop, walk, lift over 10 lbs., operate hazardous
machinery, nor operate power tools.  Dr. Pasha stated again that you are

15

permanently disabled.

Access to Public Domain under the following internet sites showed the
following (see enclosures):
- https://plus.google.com/1014463743082262404
- http://www.linkedin.com/pub/gary-mendelblatt/22/869/40a
- twitter.com/garym6165
- http://www.independentmail.com/photos/galleries/2012/apr03golf-communities-seek-to-attract-families/79928/ -
- http://www.jsonline.com/sports/golf/golfhonorag09-rv622ng-161750625.html
- http://www.jsonline.com/sports/golfhonorag09-rv622ng-16750625.html
- http://www.wsgalookup.com/gmendelblatt/recent.htm

We then performed direct observation of your activities on 10/10/2013 and
10/11/2013.  On 10/11/2013, you were observed playing golf at Hidden
Glen (see enclosures).

You were observed:
arriving at the golf course, playing golf with two other men, driving a golf
ball, driving the golf cart with one leg out, sitting in your cart, walking,
navigating and walking up a steep hill, swinging an iron, lifting the flag on
the green, bending over while putting it in, and bending over while putting
on the green.

We sent this information to Dr. Pasha on 11/7/2013 for comment as what
was observed differed greatly from Dr. Pasha's statement that you were
permanently and totally disabled. Dr. Pasha responded on 11/14/2013.  Dr.
Pasha stated that he was "surprised" to see the pictures and records
provided to him by Aetna.  Dr. Pasha stated these records showed a
"significant improvement in current ability and function since the last
evaluation in 3/2013."  Dr. Pasha continued to state at this time he will not
be doing any further disability evaluation for you.

As a result of the direct observation performed on 10/10/2013 and
10/11/2013, you demonstrated physical ability at greater than sedentary
capacity.

Sedentary capacity is classified as:

Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

Your own occupation as a Sales Compliance Consultant is classified as a sedentary occupation.

Given your demonstrated ability, you possess the physical capacity to perform your own occupation.

Your plan states (note this list is not all inclusive):

"A Period of Disability
Your period of disability ends on the first to occur of:
•       The date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled."

In view of the above, your benefits are terminated effective 11/26/2013.

We understand that you are approved for Social Security Disability (SSD) benefits.  However, our disability determination and the SSD determination are made independently and are not always the same.  The difference between our determination and the SSD determination may be driven by the Social Security Administration (SSA) regulations.  For example, SSA regulations require that certain disease/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to SSD benefits.  Or, it may be driven by the fact that we have information that is different from what SSA considered.  We have not been provided with the basis for the SSD determination, and the evidence that was relied on for the SSD determination has not been identified to us.  Therefore, even though you are receiving SSD benefits, we are unable to give it significant weight in our determination, and we find that you are not (or you are no longer) eligible for LTD benefits based on the plan definition of Totally Disabled quoted above.

17

We will review any additional information you care to submit, such as medical information from all physicians who have treated you for the conditions, including but not limited to:

- a detailed narrative report for the period 3/1/2013 through Present date, outlining the specific physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned; physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed;
- diagnostic studies conducted during the above period, such as test results, x-rays, laboratory data, and clinical findings;
- any information specific to the condition(s) for which you are claiming total disability that would help evaluate your disability status, and any other information or documentation you think may help in reviewing your claim.

You are entitled to a review of this decision if you do not agree.  To obtain a review, you or your authorized representative should submit a written request. . . .

Your written request for review must be mailed or delivered to the address above within 180 days following receipt of this notice, or a longer period if specified in our plan brochure or Summary Plan description.  . . .

If your plan is covered under the Employee Retirement Income Security Act (ERISA), and you do not agree with the final determination upon review, you have the right to bring a civil action under section 502(a) of ERISA.

[R. 1308-10 (spelling and punctuation errors corrected)].

<u>PLAINTIFF'S APPEAL</u>

Plaintiff immediately requested an appeal.  [R. 311] On November 28, 2013, Dr. Kevin J. Goniu, Mendelblatt's general practitioner, submitted a statement in support of Plaintiff's appeal, in which he expressed his disagreement with Aetna's conclusion that he was not or no longer disabled under the Auto Club Plan and the termination his

benefits. [R. 301-302]. Dr. Goniu, however, did not opine that Plaintiff was disabled from "any" occupation.  *See id.*

Plaintiff also submitted a two-sentence letter dated December 4, 2013 by Dr. Bruce T. Faure, his orthopedist, in which Dr. Faure stated, "On the basis of Mr. Mendelblatt's multiple joint replacement surgeries and ongoing systemic rheumatic disease I consider him totally disabled." R. 303.  Dr. Faure opined that Plaintiff was totally disabled from extended work activities "involving significant ambulation or repetitive activity requirements." *Id.*

As part of the appeal process, Aetna also requested independent physician reviews from specialists in orthopedic surgery and rheumatology. [R. 1241-1242]  On December 24, 2013, Dr. Martin Mendelssohn, who is Board Certified in Orthopedic Surgery, performed a physician review. [R. 294-299] Dr. Mendelssohn had a teleconference with Plaintiff's physician, Dr. Faure.  *Id.* at 298.  Dr. Faure told Dr. Mendelssohn that Plaintiff would be able to participate in functional activity that would not require significant ambulation or repetitive activity. [R. 298]  Dr. Mendelssohn also spoke with Plaintiff's general physician, Dr. Goniu, who claimed Plaintiff was unable to participate in gainful employment but could not provide evidence of any significant functional or neurological deficits.  *Id.*

Dr. Mendelssohn concluded that based on the provided medical documentation, and the teleconferences with Drs. Faure and Goniu, Plaintiff did not have a functional

impairment that would preclude him from a sedentary occupation if he was able to change positions as needed. *Id.*

On December 26, 2013, Dr. Mark R. Burns, a specialist in internal medicine and rheumatology, performed a physician review of Mendelblatt's case. [R. 275-280] Dr. Burns consulted with Plaintiff's treating rheumatologist, Dr. Pasha, whose office indicated that Dr. Pasha continued to be unwilling to participate in any disability determination. [R. 277] Dr. Burns was not able to immediately reach Dr. Goniu.  *Id.*

Dr. Burns contacted Dr. Faure who stated that he felt Plaintiff could not work at any occupation regularly despite his ability to play golf. *Id.* Dr. Faure believed Plaintiff's history of multiple surgeries in-and-of-itself established restrictions from any occupation; but he did not identify any specific restrictions. [R. 278].

Based on the provided documentation, and telephonic consultations, Dr. Burns opined that there were impairments from November 26, 2013 forward; however, they would not preclude Plaintiff from performing a sedentary occupation. [R. 278] Dr. Burns stated that the most recent clinical notes, which were from July 2012 and September 2012, did not establish specific restrictions.  *Id.*

Dr. Burns also viewed the surveillance videos and noted that the surveillance indicated that Mendelblatt was capable of golfing for 2 days in a row for at least several hours.  *Id.*  Dr. Burns further observed the following about Plaintiff:  he had a gait with normal cadence; he could manage a small hill on a golf course with normal stride; he was

20

able to fully abduct the shoulders and handle a golf swing; he was able to bend at the tee, putting and at his car; and he could handle a small bag, ball, clubs, swing, handle keys and car doors, drive a car and a golf cart. *Id.* Dr. Burns found that there was no apparent impairment of hand function or reach; however, because of the hip stiffness and multiple surgeries in back/neck/hip/ knee, Dr. Burns limited lift/carry/push/pull to 20 pounds, occasionally. *Id.* He further opined that the available information did not establish any limitation to sit/stand/walk, nor to postural changes. *Id.*

On January 3, 2014, Dr. Burns was able to reach Plaintiff's physician, Dr. Goniu, and provided an addendum to his report. [R. 279-280] Dr. Goniu did not note specific impairments but instead based his opinion on his understanding that Plaintiff's orthopedists concluded that he was disabled. [R. 279] Dr. Burns reasoned that if Plaintiff was able to achieve a level of function that allowed him to regularly and independently play golf without assistance, then the implication was that he could perform in the workplace, as well. *Id.* Dr. Burns did not change his opinion based on his discussion with Dr. Goniu, but he noted there was a discrepancy between the attending physician's assessment of functional capacity and the claim file documentation. [R. 280]

Plaintiff also provided his own personal narrative as part of his appeal as to why he believed he should be deemed disabled in a letter to Aetna Disability Claims Specialist Jason Gravel dated December 27, 2013. [*See* R. 300.] In that letter, Mendelblatt claimed that his position was not a sedentary position because he was in charge of five states and

21

had to travel to Dearborn, Michigan for meetings once a month. *Id.* Also submitted to

Aetna in support of Plaintiff's appeal were records from Dr. James Stoll, an orthopedic

surgeon, indicating that on December 27, 2013, Mendelblatt underwent elective a

decompressive laminectomy due to L3-L4 Spinal Stenosis. [R. 270] It was noted in these

records, however, that postoperatively, his leg pain improved. *Id.* Dr. Stoll also

submitted a letter dated December 28, 2013, in support of Plaintiff's appeal. [*See* R.

269.] In this letter, Dr. Stoll voiced his disagreement with Aetna's conclusion that

Plaintiff was not disabled. [R. 269.]

After reviewing all of the medical information in Mendelblatt's file, including the

information specifically submitted in connection with Plaintiff's appeal, on January 8,

2014, Aetna upheld the termination of Mendelblatt's LTD benefits, effective November

26, 2013. [*See* R. 1312-1315]. Aetna explained:

> Our records show that the first day you were absent from work was
> February 01, 2008, and  your benefits began July 30, 2008, following a 6
> month waiting period.  However, Aetna terminated your benefits because
> the medical information did not support a functional impairment that would
> prevent you from performing the material duties of any occupation.  You
> have appealed this decision and we have concluded our appellate review.
>
> Our review included all medical information in your Long Term Disability
> file.  Please note that while we reviewed all information in your file, not
> every piece of documentation will necessarily be referenced in this letter.
> To give your claim every consideration, we forwarded it for review by
> independent physician reviewers, who specialize in Rheumatology and
> Orthopedic Surgery.  The independent physician reviewers reviewed the
> medical information, and rendered an opinion with regard to functionality.
>
> For the medical documentation, you were treating with Dr. Pasha,

Rheumatologist, since at least 2010 for psoriatic arthritis with spondyloarthropathy, as well as degenerative joint disease (DJD) of the knees.

We received an Attending Physician Statement (APS) and Capabilities and Limitations Worksheet dated March 05, 2013 on which the physician notes global severe restrictions and that you were totally disabled.

On July 12, 2013, a confidential investigative report was completed. However, you were not observed during the direct observation which was split into one full day and two half days.

On October 11, 2013, a second confidential investigative report was completed.  It indicated that upon direct observation, you arrived at a golf course, you golfed and had the ability to bend when you were on the putting green, you were able to use golf clubs and drive a golf cart, as well as drive your own vehicle.  It was reported you played golf for 2 consecutive days.

On November 1, 2013, a golf activity sheet from Hidden Glen at Bentdale Farms was provided. Documentation indicates you golfed 11 times in October 2013 and documented 9 times in September 2013 with golf scores ranging from 75-88.

After the direct observation, information was sent to Dr. Pasha.  Dr. Pasha sent a letter dated November 14, 2013, in which he indicated Dr. Schrager, your previous rheumatologist, had deemed you to be disabled and Dr. Pasha assumed your care on January 20, 2012.  Dr. Pasha was surprised at your significant improvement and your current ability to function since your last disability evaluation of March 2013.  Dr. Pasha indicated he would not do any further disability evaluations for you.

On November 28, 2013, Dr. Goniu provided a letter on your behalf.  Dr. Goniu reported you were under his care since 2009.  Dr. Goniu indicated Social Security and your employer considered you to be disabled since you were unable to physically perform the demands of your occupation as an outside sales representative with a national account balance, and he opined that remains the case. Dr. Goniu further notes that the physical demands of your occupation in outside sales, which required you to travel nationally, versus the recurrence of getting in and out of a golf cart, picking up golf

23

clubs, and swinging a golf club are markedly different.

On December 04, 2013, Dr. Faure provided a letter indicating you were totally disabled. He indicated you were capable of single-event activity but would not expect you to have the capabilities for extended work activities involving significant ambulation or repetitive activity requirements.

During the medical review, we instructed the independent physician reviewers to contact Dr. Bruce Faure and Dr. Kevin Goniu to discuss the severity of your condition. We also asked the reviewers to obtain information about how your condition affects your ability to perform any occupation.

The independent physician reviewer who specializes in Orthopedic Surgery conducted a peer-to-peer consultation with Dr. Faure on December 19, 2013. Dr. Faure indicated you would be able to participate in a functional activity that would not require significant ambulation or repetitive activity because of your severe psoriatic arthritis and multiple surgeries.

On December 19, 2013, the independent physician reviewer contacted Dr. Kevin Goniu. Dr. Goniu indicated you had psoriatic arthritis and had undergone multiple procedures. Dr. Goniu indicated your need for various medications and that you were unable to participate in gainful employment. However, he could not provide evidence of any significant functional or neurological deficiencies.

The independent physician reviewer who specializes in Rheumatology conducted a peer-to-peer consultation with Dr. Faure on December 26, 2013. Dr. Faure feels that with so many joint replacements and with ongoing flares of arthritis that you are unable to work at any occupation. Dr. Faure indicated he did not feel your ability to participate in golfing equated to work capacity. He indicates that although you are able to play a game of golf this does not mean you have the ability to work and that you are totally and permanently disabled.

An attempt was made to Dr. Goniu to conduct a peer-to-peer consultation by the reviewing Rheumatologist, but he was unsuccessful in reaching him.

After the review of the medical documentation, the independent physical reviewer who specializes in Rheumatology opined, in pertinent part, the

24

following:  The direct observation establishes certain functions that you are able to perform.  You were out 2 days in a row golfing for several hours. Although you used the cart instead of walking, you were able to handle the cart which requires physical effort.  Your gait was normal and you were capable of managing a small hill on the golf course with normal stride. You had the ability to fully abduct the shoulders and handle the golf swing with noted hip stiffness, but no limitation in full arm follow through.  You were able to bend at the tee and although you had hip stiffness and multiple surgeries, there were no limitations noted in your sitting, standing, walking and reaching.

There is no documentation that there have been significant flares of synovitis since the last progress notes submitted for review.

Due to the unsuccessful peer to peer between the reviewing Rheumatologist and Dr. Goniu, we faxed a copy of the physician's report for him to review. We asked Dr. Goniu to review the report and provide any objective documentation to support his opinion, if he disagreed.

On January 03, 2014, the independent physician reviewer who specializes in Rheumatology conducted a peer-to-peer consultation with Dr. Goniu. Dr. Goniu was unable to proved any specific impairments, however he indicated your orthopedists have concluded that you were disabled.  He indicated you maintain a level of function through the use of many medications.  The independent physician reviewer explained to Dr. Goniu that the level of functioning he had to play golf indicates he has the function to perform in any occupation.

Dr. Goniu indicated you had a history of achalasia and you were status post a myotomy in July 2013.  Your symptoms have gotten much worse and you were hospitalized November 2013 with aspiration pneumonia.

Based upon our review of the information you provided, and as explained in more detail above, we have determined that there was insufficient medical evidence to support your disability as of November 26, 2013. Although you had a history of Psoriatic Arthritis and are status post multiple surgeries, you have the ability to perform any occupation. Therefore, the original decision to terminate LTD benefits, effective November  26, 203 has been upheld.

[R. 1312-1315.]

Pursuant to his rights under ERISA, Plaintiff thereafter instituted this action for denial of disability benefits.

## III.  DISCUSSION

A.   STANDARD SCOPE OF REVIEW

The Supreme Court has ruled that the standard of review in ERISA denial of benefits cases is *de novo* unless the benefit plan gives the plan administrator discretion to determine eligibility for benefits or construe plan terms:

> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989). *See also, McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1063 (6th Cir.2014); *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 616 (6th Cir. 1998). If a plan grants such discretion to an administrator or fiduciary, then the court must review the denial of benefits under the "arbitrary and capricious" standard.  *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 547 (6th Cir.2015) (citing *Marks v. Newcourt Credit Grp., Inc*., 342 F.3d 444, 456 (6th Cir.2003)); *see also Williams v. International Paper Co.,* 227 F.3d 706, 711 (6th Cir. 2000).

The arbitrary and capricious standard is a highly deferential one.  *See Killian v. Healthsource Provident Adm'rs, Inc*., 152 F.3d 514, 520 (6th Cir.1998) (citing *Yeager v.*

26

*Reliance Standard Life Ins. Co*., 88 F.3d 376, 380 (6th Cir.1996)); *see also McLain v. Eaton Corp. Disability Plan,* 740 F.3d at 1064. ("[T]he arbitrary and capricious "standard is extremely deferential and has been described as the least demanding form of judicial review." (citations omitted)). "An 'extremely deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision.'" *Id.* "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Perry v. United Food & Commercial Workers Distrib. Unions 405 & 422*, 64 F.3d 238, 242 (6th Cir.1995); *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir.1989), *cert. denied,* 495 U.S. 905 (1990). Thus, "[a]lthough the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious." *Schwalm v. Guardian Life Ins. Co. of America*, 626 F.3d 299, 308 (6th Cir. 2010) (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000)). "A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from 'a deliberate principled reasoning process' and is supported by 'substantial evidence.'" *Id.* (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)).

By contrast, when conducting a *de novo* review of a plan administrator's decision in an ERISA denial-of-benefits case, the district court must take a "fresh look" at the

27

administrative record, *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998), "without deference to the decision or any presumption of correctness." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir.1990).

Whether the standard is "arbitrary and capricious" or *de novo*, the Court is to conduct its review based "solely upon the administrative record," *Wilkins, supra*, and may not consider "evidence not presented to the plan administrator." *Perry, supra.*

The LTD Plan in this case expressly grants to Aetna "discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy." [Plan, p. 25.] Therefore, pursuant to *Bruch* and its progeny, the arbitrary and capricious standard of review applies.

Plaintiff argues, however, that the Plan provision granting Aetna discretionary authority has been rendered null and void by Michigan law, and therefore, the *de novo* standard of review should apply. Specifically, Plaintiff argues that section 500.2202 of the Michigan Administrative Code, which took effect June 1, 2007, prohibits insurers from issuing insurance policies which contain discretionary clauses. This section, which was promulgated under the authority of the Michigan Office of Finance and Insurance Services, provides:

> (a) A discretionary clause unreasonably reduces the risk purported to be assumed in the general coverage of the policy within the meaning of MCL 500.2236(5).

28

(b)  On and after the first day of the month following the effective date of these rules, an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause.  This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.

(c)  On and after the first day of the month following the effective date of these rules, a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect.  This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

Mich. Admin. Code R. 500.2202.

A "discretionary clause" is defined in R. 500.2201(c) as

a provision in a form that purports to bind the claimant to or grant deference in subsequent proceedings to the insurer's decision, denial, or interpretation on terms, coverage, or eligibility for benefits including, but not limited to, a form provision that does any of the following:

* * *

(vi)  Provides that or gives rise to a standard of review on appeal that gives deference to the original decision.

(vii)  Provides that or gives rise to a standard of review on appeal other than a *de novo* review.

Mich. Admin. Code R. 500.2201(c)(vi), (vii).[5]

---

[5]  Although this case is governed by ERISA, which normally preempts any state law that relates to employee benefit plans, *see Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct, 1549, 1552 (1985), state laws that regulate insurance are "saved" from preemption pursuant to ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(B)(2)(A).  "For a state law to be deemed a 'law... which regulates insurance' under § 1144(b)(2)(A), it must satisfy two requirements.  First, the state law must be specifically directed toward entities engaged in insurance.  Second, [] the state law must substantially affect the risk pooling arrangement between the insurer and the insured."  *Ky. Ass'n of Health Plans, Inc. v.*

Because the Auto Club Plan provided LTD benefits through a group policy issued by Aetna, was delivered in Michigan, and states that it "will be construed in line with the law of the jurisdiction in which it was delivered," [*see* Plan, p. 4], Plaintiff argues that the inclusion of the discretionary grant of authority to Aetna in the Plan is null and void.

The flaw in Plaintiff's reasoning is that the group policy in question here was issued on March 30, 2007, i.e., before the effective date of Michigan Administrative Code R. 500.2201-2202, and *was never revised thereafter in any respect*. *See* Declaration of Aetna Supervisor Susan Z. Quigley, Defendant's Response Brief, ¶¶ 5-7.[6] Regulation 500.2202 became effective June 1, 2007. By its own terms, R. 500.2202 does not apply to policies that were not amended on or after June 1, 2007. *See White v. Standard Ins. Co.*, 529 F. App'x 547, 552 (6th Cir. June 28 2013) (citing *Morrison v. Unum Life Ins. Co. of Am.*, 730 F. Supp. 2d 699, 706 (E. D. Mich. 2010) ("[T]he intended purpose of the Regulation was to invalidate discretionary clauses in contracts which existed prior to its effective date, but only from and after any revision occurring on or after July [sic; June] 1, 2007.") For these reasons, the Court concludes that Mich.

---

*Miller*, 538 U.S. 329, 341, 123 S.Ct. 1471, 1479 (2003) (internal citations omitted). Applying the *Miller* test, the Sixth Circuit has held that Mich. Admin. Code R. 500.2201-2202 are saved from preemption under 29 U.S.C. § 1144(B)(2)(A). *See American Council of Life Insurers v. Ross*, 558 F.3d 600 (6th Cir. 2009).

[6] "The Court is not prohibited from considering evidence outside of the administrative record to ascertain the appropriate standard of review...." *Weinkauf v. Unicare Life & Health Ins. Co.*, 2010 WL1839441 at * 4 (citing *Daniel v. Unum Provident Corp.*, 261 F. App'x 316, 318 (2d Cir. 2008)).

30

Admin. Code R. 500.2202 does not void the discretionary clause in the Auto Club LTD Plan. Accordingly, the arbitrary and capricious standard will govern the Court's review of the Plan administrator's decision.

B.   <u>SCOPE OF REVIEW</u>

As indicated above, whether the standard of review is "arbitrary or capricious" or *de novo*, the Court's review is confined to the record that was before the Plan Administrator when the final decision was rendered. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d at 615; *Judge v. Metropolitan Life Ins. Co.*, 710 F.3d 651, 568 (6th Cir. 2013). The Court may not consider "evidence never presented to the plan administrator." *Perry v. Simplicity Engineering,* 900 F.2d at 966.

Plaintiff Mendelblatt has appended to his Brief in Support of his request for reversal of the plan administrator's decision documents outside of the administrative record concerning his award of SSDI benefits. These appear to be the disability determination made by the Social Security Administration in awarding Mendelblatt SSDI benefits, the SSA transmittal document, and two SSA case analyses, none of which were ever presented to the Plan Administrator. Plaintiff seeks to rely on these SSA documents in support of his claim that Aetna's medical analysis was erroneous. However, because the evidence pertaining to Plaintiff's social security award is not part of the administrative record, it cannot be considered. *See Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734, 747 (6th Cir. Mar. 29, 2005). Accordingly, the Court

31

will consider only the information submitted before Aetna's January 8, 2014 final

decision on appeal.

C.     THE PLAN ADMINISTRATOR DID NOT ACT ARBITRARILY OR
       <u>CAPRICIOUSLY IN TERMINATING PLAINTIFF'S LTD BENEFITS</u>

       As set forth above, under the arbitrary and capricious standard, a court will uphold

a plan administrator's benefit determination if that determination was rational in light of

the plan's provisions.  *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1987), *cert.*

*denied*, 488 U.S. 826 (1988).  Stated differently, "when it is possible to offer a reasoned

explanation, based on evidence for a particular outcome, the outcome is not arbitrary and

capricious." *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d at 693.

       Here, the administrative record more than abundantly supports the conclusion that

the Administrator's decision was both reasonable and "rational in light of the plan's

provisions."

       The Administrator's reason for terminating Mendelblatt's LTD benefits as of

November 26, 2013 was that he no longer met the definition of "disability" under the

Plan.  The applicable definition of disability required evidence that Plaintiff was "not

able to work at any reasonable occupation." [*See* Plan, p. 34.]  In seeking reversal of the

Administrator's decision, Plaintiff argues that Aetna made the determination that he was

no longer disabled by relying exclusively on the results of file reviews performed by non-

examining physicians while all of Plaintiff's numerous treating physicians support his

total disability.

32

First of all, not all of Plaintiff's treating physicians "support his total disability." Certainly Dr. Pasha no longer continues to support Plaintiff's claim of disability. And, Dr. Faure stated only that he "would not expect him to have the capability for extended work activities involving significant ambulation or repetitive activity requirements." [R. 303.] Dr. Goniu also opined that "Plaintiff [could] certainly sit at a desk and hold a pen, but he [was] completely incapable of carrying and lifting luggage or a briefcase." [R. 301-02]. While Dr. Goniu later opined that Plaintiff was unable to participate in gainful employment, he could not provide evidence of any significant functional or neurological deficits and did not identify any basis for the change in his opinions, particularly in light of the evidence about Plaintiff's actual functional activities. [R. 298].

But even if in the opinion of Plaintiff's treating physicians Plaintiff is disabled, contrary to Plaintiff's assertions, a plan administrator is not required to accord any special deference to treating physicians' opinions. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 831 (2003).

Moreover, the plan administrator is not required to provide any particular explanation for rejecting the opinion of a treating physician. *Id.* at 831. As the Supreme Court stated in *Nord*,

> Courts have no warrant to require administrators automatically to accord special weight to the opinions of the plaintiff's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Nord* at 825, 834.

33

Furthermore, "there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 297 n. 6 (6th Cir.2005).  Nor is a plan administrator arbitrary and capricious in relying on the opinions of doctors who did not examine Plaintiff over those of his examining doctors.  *See Brown v. Federal Express Corp.*, 610 F. App'x 498, 505 (6th Cir. May 5, 2015). While the opinions of the claimant's doctors may not be summarily rejected, where, as here, reasons are given for adopting an alternative opinion the plan administrator has not acted arbitrarily or capriciously.  *See Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 548-49 (6th Cir.2015).  *See also Curry v. Eaton Corp.*, 400 F. App'x 51, 60 (6th Cir. 2010) (stating that while a plan administrator may not simply choose to ignore a treating physician's opinions, "it can resolve conflicts between those opinions and the opinions of its own file reviewers if it provides reasons -- including a lack of objective evidence -- for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review.")

 "[W]hen a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits," the decision "cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir.2003).  It does not matter that this choice is between a non-treating and a

34

treating physician.  *See Brown v. Federal Express*, 610 F. App'x at 505 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. at 825).

Further, although the Auto Club LTD Plan gave the administrator the right to require Plaintiff to undergo a physical examination, it did not mandate that a physical examination be performed.  [*See* Plan, p. 42].  "[T]he failure to conduct a physical examination -- especially where the right to do so is specifically reserved in the plan -- may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295.  But "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly." *Id*.

Plaintiff also asserts that Aetna erroneously disregarded the Social Security Administration's award of SSDI benefits to him.  He contends that his SSDI award conclusively establishes his total disability and his entitlement to continued benefits under the Auto Club LTD Plan.  Plaintiff is mistaken.

It is well-established that an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan. *Whitaker v. Hartford Life and Acc. Ins. Co*., 494 F.3d 947, 949 (6th Cir. 2005).  As the Supreme Court noted in *Nord*, entitlement to Social Security benefits is measured by a uniform set of federal criteria. But a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria. *Id.*  Furthermore, the Sixth Circuit has held that it is only a plan administrator's failure to explain a decision

35

contrary to an SSA decision that may be indicative of an arbitrary and capricious determination.  *Bennett v. Kemper Nat'l Servs, Inc.* 514 F.3d 547, 553 n. 2 (6th Cir. 2008).

Aetna correctly explained in terminating Mendelblatt's LTD benefits the reasons it was not giving Plaintiff's SSDI award significant weight.  There are substantial differences between the SSA's and the Auto Club Plan's working definitions of disability.  For example, the regulations governing eligibility for SSDI benefits provide that when a claimant has established that he cannot perform "past relevant work," the burden shifts to the Secretary to show that other jobs that the claimant can perform are available in the national economy. See 20 C.F.R. § 404.1520.  Additionally, the Medical-Vocational Guidelines allow for a presumption of disability based upon a claimant's age, prior work experience, education, and restriction  to sedentary work. See 20 C.F.R. Pt. 404,  Subpt. P., App. 2. The Auto Club LTD Plan contains no such burden-shifting device or presumption of disability.  Rather, as indicated above, under the applicable definition of disability in the Auto Club Plan, to be entitled to LTD benefits required establishing that Plaintiff was "not able to work at any reasonable occupation."  [ Plan, p. 34.]

For all of the foregoing reasons, the Court finds that the Plan Administrator did not act arbitrarily or capriciously in its consideration of, and its ultimate decision terminating Plaintiff's claim for Long-Term Disability Benefits as of November 26, 2013.  To the

36

contrary, the Plan Administrator's decision was both reasonable and rational in light of the Plan provisions.

## **CONCLUSION**

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Entry of Judgment on the Administrative Record **[Dkt, # 24]** is GRANTED and Plaintiff's Motion for Entry of Judgment under *Wilkins* **[Dkt. 25]** is DENIED.

s/Gerald E. Rosen
United States District Judge

Dated:  February 22, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 22, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135